**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                    )
CLINICAL TECHNOLOGY, INC.,          )
                                    )
                  Plaintiff,        )
                                    )
v.                                  )          Civil Action
                                    )        No. 14-12169-PBS
COVIDIEN SALES, LLC,                )
                                    )
                  Defendant.        )
_____)
```

**MEMORANDUM AND ORDER**

June 16, 2016

Saris, C.J.

**INTRODUCTION**

Plaintiff Clinical Technology, Inc. (CTI), is a specialty distributor of medical products in the Midwest. CTI brings this action against Defendant Covidien Sales, LLC, alleging breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), unjust enrichment (Count III), negligent misrepresentation (Count V), and violations of Massachusetts General Laws Chapter 93A, § 11 (Count VI).[1] The claims all arise from Covidien's termination of a written distribution agreement, under which CTI sold Oridion

---

[1] The plaintiff alleged tortious interference with contractual relations in the complaint (Count IV), but withdrew this claim in its opposition to the present motion.

1

Capnography, Inc., products from 2008 to 2013. CTI first entered into the distribution agreement with Oridion in June 2008. In June 2012, Covidien acquired Oridion, and became the successor-in-interest to the distribution agreement.

Roughly eight months later, in February 2013, Covidien notified CTI that it was exercising its contractual right to terminate the agreement. The termination had an effective date of March 31, 2013. The parties agree that § 15 of the distribution agreement gave Covidien the right to terminate the agreement, but dispute the meaning of other termination provisions. Covidien now moves for summary judgment on the ground that the contract language is unambiguous.

CTI argues that § 15(d) of the distribution agreement obligated Covidien to continue selling products to CTI after termination so that CTI could sell such products to specific end users, which had fixed-term contracts, for the duration of those end-user agreements. CTI also alleges that Covidien engaged in deceptive practices surrounding contracts it signed directly with some of CTI's customers. Covidien responds that there are no genuine disputes of material fact as to the meaning of the agreement because it states that Covidien, not CTI, is entitled to sell directly to end users upon termination. Covidien further maintains that there is no evidence of unfair or deceptive

2

conduct. The Court **ALLOWS** in part and **DENIES** in part the Motion for Summary Judgment for the reasons that follow.

**UNDISPUTED FACTS**

With all reasonable inferences drawn in favor of the nonmoving party, CTI, the following facts are not in dispute, except where noted.

## I.    **The Distribution Agreement**

Oridion Capnography, Inc. sold noninvasive ventilation monitoring equipment and products. Oridion's relationship with CTI began in 2004, when the parties entered a prior contract for CTI to distribute Oridion products from October 20, 2004 to June 11, 2008. In late 2007, Oridion presented CTI with a new, form distribution agreement, which required CTI to make some up-front investments. For example, it required CTI to invest in clinical employees to train end users on the monitoring equipment Oridion and CTI sold.

CTI President, Dennis Forchione, was initially reluctant to sign the new agreement because he was concerned that the contract did not provide sufficient protection for such investments in the event Oridion later terminated the agreement. Section 15(a)(ii) of the agreement granted Oridion the right to terminate the agreement "immediately upon delivery of written notice to Distributor: (x) if there shall be a 'Change of Control' of the Company or any of its parent entities; or (y)

the Company, in its sole discretion, determines to engage in a direct sales effort in the Territory." Draft Agreement, Docket No. 68, Ex. 8, at 16. Section 15(c) outlined the compensation CTI would receive if Oridion terminated the agreement:

> In the event of a termination of this Agreement pursuant to Sections 15(a)(ii), the Company hereby agrees to pay Distributor an amount equal to 5% of the net revenue collected by Company attributable to sales of Products in the Territory during the 12 month period immediately prior to such termination (as determined by the Company in its sole discretion) and shall not owe Distributor any other compensation whatsoever.

Id. Mr. Forchione approached Oridion's President, Gerald Feldman, about Forchione's concerns with these provisions, and suggested adding a provision that would have required Oridion to pay CTI a "buyout" or its "lost profit" after termination. Forchione Dep., Docket No. 74, Ex. B, at 44-49. Mr. Feldman rejected this suggestion, and after further negotiations, the parties ultimately agreed upon a separate change to § 15. Section 15(d) of the new agreement originally stated:

> Should the Company choose to terminate this Agreement, the Company shall be obligated to honor those agreements between Distributor and end-users of Company Products provided for by this Agreement until the next anniversary of the Agreement after termination, and shall sell Products to such Hospitals, ambulatory surgery centers, outpatient surgery centers and EMS Environments at established Oridion ODN Prices.

Draft Agreement, Docket No. 68, Ex. 8, at 16 (emphasis added). The final version of § 15(d) that the parties signed states:

> Should the Company choose to terminate this Agreement,
> the Company shall be obligated to honor those agreements
> between Distributor and end-users of Company Products
> provided for by this Agreement <u>until the termination of
> Distributor's agreements with end-users</u>, and shall sell
> Products to such Hospitals, ambulatory surgery centers,
> outpatient surgery centers and EMS Environments at
> established Oridion ODN Prices.

Amended and Restated Distribution Agreement, Docket No. 74, Ex.

E, at 15.

    According to CTI, Mr. Forchione's intent in negotiating the

change to § 15(d) was to allow CTI to continue to supply end

users until the end of their contracts' terms in the event

Oridion terminated the distribution agreement. Such an

arrangement would "protect CTI's investments on an account-by-

account basis post-termination" by requiring Oridion to sell

products to CTI that CTI would then sell to the end users until

expiration of the end-user contracts. Docket No. 75, at 3. In

signing the 2008 distribution agreement, Mr. Forchione

highlighted and initialed the change to § 15(d) in order to draw

attention to the revised language.

    The parties did not change the above-quoted language in

§ 15(a)(ii) or § 15(c) in the final 2008 distribution agreement.

Thus, Oridion maintained the right to terminate the agreement

"to engage in a direct sales effort" in CTI's territory, and the

final agreement states that in the event of such a termination,

Oridion would not owe CTI any compensation beyond "an amount

equal to 5% of the net revenue collected by [Oridion] attributable to sales of Products in the Territory during the 12 month period immediately prior to such termination." Amended and Restated Distribution Agreement, Docket No. 74, Ex. E, at 14–15. The final agreement also included a clause specifying that § 15 would survive termination. Id. at 15.

Under the agreement, CTI was the exclusive distributor for some Oridion products, such as "filterlines,"[2] in the Midwest from June 2008 until April 2013. CTI purchased products from Oridion at one price, and then sold them to its customers, the end users, at a mark-up. Section 8(b) of the agreement required CTI to use "its best efforts to actively promote sales" of Oridion products within its defined territory. Id. at 9. The initial contract term was for two years, with automatic renewal periods thereafter, unless Oridion provided CTI with notice of non-renewal ninety days prior to end of the previous term.

Section 1(g) of the distribution agreement defines the term "Oridion ODN Price" used in § 15(d) as "the Oridion ODN price as listed in the Oridion Pricing Handbook." Id. at 5. The parties agree that this definition refers to the discounted price at which distributors, like CTI, purchased product from Oridion, sometimes called the distributor or wholesale price. The parties

---

[2] Filterlines are tubing for noninvasive monitoring of a patient's carbon dioxide levels.

further agree that Oridion/Covidien would not, and did not, sell
product to end users at this distributor price, despite the fact
that the agreement states that in the event of termination,
Oridion/Covidien "shall sell" products to end users "at
established Oridion ODN Prices." Id. at 15. The parties dispute
whether the parties intended "Oridion ODN Price" in § 15(d) to
mean the distributor price, as the § 1(g) definition would
require, or instead intended it to mean the price that CTI was
charging its end users at the time of the agreement's
termination. Finally, the agreement also contained a merger
clause in § 17(e):

> This agreement constitutes the entire agreement of the
> parties with respect to the subject matter hereof and
> supersedes and cancels all prior agreements, claims,
> representations, and understandings of the parties in
> connection with such subject matter, including, but not
> limited to, Non-Exclusive Distributor Agreement, October
> 20, 2004, which has been amended and restated hereby.
> Except as otherwise expressly provided above, this
> Agreement shall not be modified or amended except by
> written agreement signed by duly authorized
> representatives of each of Distributor and the Company.

Id. at 16.

## II.   **Integrated Delivery Network Agreements**

Oridion (and later Covidien) and CTI amended their
agreement multiple times over the course of its five-year
duration to account for pricing agreements with certain end
users, who signed Integrated Delivery Network (IDN) contracts
directly with Oridion/Covidien. An IDN is a group of hospitals

or other end users with consolidated purchasing; by consolidating, the group can obtain better leverage in negotiating prices and services. CTI alleges that the IDNs at issue in this case were all pre-existing CTI customers. Covidien admits that at least some of the IDN end users were pre-existing customers of CTI, but contends that some of the IDN contracts spanned multiple territories and involved IDN facilities that CTI had not sold to before.

Although CTI was not a party to the IDN contracts, CTI helped to negotiate and approved the pricing in the IDN contracts. CTI was also named as the exclusive distributor in the IDN contracts, and, thus, continued to sell products to the IDNs after they signed contracts with Oridion/Covidien. Oridion began entering into IDN contracts directly with CTI customers roughly two years after signing the 2008 Oridion-CTI distribution agreement. The IDN contracts typically contained three-year terms. Each time Oridion/Covidien entered into an IDN contract, CTI and Oridion/Covidien amended the distribution agreement by adding a one-page document outlining the price to be charged to both CTI and the IDN end user based on the new IDN agreement.

Ten of the nineteen end users at issue in this case had IDN contracts with Oridion/Covidien. Eight of the remaining nine end users are hospitals or hospital groups that had supply

agreements with CTI covering Oridion products, but did not have contracts directly with Oridion/Covidien. The parties dispute whether the end user Sparrow Health had finalized an IDN contract by the time Covidien terminated its distribution agreement with CTI. CTI asserts that Sparrow Health told CTI days before termination that the IDN contract had been finalized, but CTI does not have a signed copy of the agreement.

## III.  **Termination**

In April 2012, an Oridion employee, Tom Millonig, informed CTI and other Oridion distributors that an affiliate of Covidien had agreed to acquire Oridion. The acquisition closed in June 2012, at which point Covidien Sales, LLC, became the successor-in-interest to the 2008 Oridion-CTI distribution agreement. Approximately eight months later, in February 2013, Covidien sent CTI written notice of its decision to terminate the agreement, pursuant to § 15(a)(ii), "to engage in a direct sales effort" in CTI's territory. Amended and Restated Distribution Agreement, Docket No. 74, Ex. E, at 14. Covidien credited "5% of the net revenue collected by [Oridion/Covidien] attributable to sales of Products in the Territory during the 12 month period immediately prior to such termination," to CTI, in accordance with the termination-fee provision in § 15(c). Id. at 15.

CTI responded to the termination notice through outside counsel on March 21, 2013, asserting that it expected Covidien

to continue shipping products to CTI under § 15(d) so that CTI could fulfill the end-user agreements through their respective termination dates. Covidien's counsel responded that it interpreted § 15(d) to mean that Covidien, not CTI, would fulfill the end-user agreements upon termination of the 2008 Oridion-CTI distribution agreement. The termination took effect on March 31, 2013, and Covidien began its direct sales effort on April 1, 2013.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence supporting the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once such a showing is made, the burden shifts to the nonmoving party, who must, with respect to each issue on which it would bear the burden of proof at trial, come forward with facts that demonstrate a genuine issue. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing Celotex, 477 U.S. at 324); Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 152-53 (1st Cir. 2009).

"A genuine issue exists where a reasonable jury could resolve the point in favor of the nonmoving party." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (internal quotation marks and citations omitted). "A party cannot survive summary judgment simply by articulating conclusions the jury might imaginably reach; it must point to evidence that would support those conclusions." Packgen v. BP Expl., Inc., 754 F.3d 61, 67 (1st Cir. 2014). A material fact is "one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

In its review of the evidence, the Court must examine the facts in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor, to "determine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Sands, 212 F.3d at 661 (internal quotation marks omitted). The Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation" at the summary judgment stage. Chiang v. Verizon New England Inc., 595 F.3d 26, 30 (1st Cir. 2010). "Ultimately, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Sensing, 575 F.3d at 163 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

## II.  **Breach of Contract**

### A. Legal Standard

CTI claims that Covidien breached § 15(d) of the 2008 Oridion-CTI distribution agreement by selling products directly to nineteen specific end users, after terminating the agreement in March 2013. To interpret the 2008 distribution agreement, the Court must first assess whether the contract at issue is ambiguous, a question of law in Massachusetts. Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013). The Court bases this determination on an examination of the contract's plain text, "independent of extrinsic evidence concerning the drafting history or intention of the parties." Id. (quoting Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 907 (Mass. 2008)).

"Language is only ambiguous 'if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'" Id. (quoting Lass v. Bank of Am., N.A., 695 F.3d 129, 134 (1st Cir. 2012)); see also Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (noting "a contract is only ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken" (internal quotation marks and citations omitted)). A contract is not

ambiguous just because the parties disagree about its meaning. Barclays, 710 F.3d at 21 (citing Farmers Ins., 632 F.3d at 783).

If the contract is found free from ambiguity, the Court must interpret it according to its plain terms, taking "the words within the context of the contract as a whole, rather than in isolation." Barclays, 710 F.3d at 21. "Summary judgment is appropriate when those plain terms unambiguously favor either side." Farmers Ins., 632 F.3d at 784. "On the other hand, if the contract's terms are ambiguous, contract meaning normally becomes a matter for the factfinder, and summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary." Id.; see also Mason v. Telefunken Semiconductors Am., LLC, 797 F.3d 33, 38 (1st Cir. 2015) ("But if the extrinsic evidence bearing on the meaning of the relevant language is 'contested or contradictory,' summary judgment will not lie." (quoting Allen v. Adage, Inc., 967 F.2d 695, 703 n.3 (1st Cir. 1992))).

## B. The Plain Text of § 15(d)

Here, Covidien argues that there is no genuine dispute of material fact with respect to CTI's breach of contract claim, and that Covidien is entitled to judgment as a matter of law, because the plain language of the agreement unambiguously grants Covidien the right to sell to end users upon termination. In the

alternative, Covidien argues that even if the language is ambiguous, the extrinsic evidence is so one-sided that no reasonable jury could find in CTI's favor. CTI responds that five phrases in § 15(d) introduce ambiguity with respect to which party is entitled to sell to the end users after termination, such that summary judgment is not appropriate, including: "honor those agreements," "provided for by this Agreement," "Distributor's agreements with end-users," "and shall sell," and "Oridion ODN Prices." Docket No. 75, at 9.

First, CTI maintains that the language requiring Covidien to "honor those agreements" between CTI and the end users is ambiguous because Covidien could "honor" them either by maintaining CTI's role as the exclusive distributor, or by honoring the price and other terms contained within the end-user agreements, while serving as the distributor itself. According to CTI, the better interpretation of "honor" is to require Covidien to uphold all of the terms within the end-user contracts, including the term that lists CTI as the distributor. Meanwhile, Covidien cites to the dictionary definition of "honor," which is "to do what is required by (something, such as a promise or a contract)," to support its argument to the contrary. Docket No. 67, at 7 (quoting the Online Merriam-Webster Dictionary). Covidien maintains that because it is the party with the contractual obligation to "honor" the agreements,

14

it must also be the party that does what they require, including selling Oridion products to the end users itself after termination.

Next, CTI argues that the phrase "provided for by this Agreement" in § 15(d) is ambiguous because it could modify either the entire preceding clause, "those agreements between Distributor and end-users of Company Products," or just the last antecedent, "Company Products." CTI maintains that it modifies the entire preceding clause, and thus encompasses all the IDN agreements "provided for" in amendments to the 2008 distribution agreement. Remember that each time Oridion/Covidien entered into an IDN contract with an end user, CTI and Oridion/Covidien amended the 2008 agreement to incorporate the pricing in the new IDN contract.

Covidien responds that even if the phrase "provided for by this agreement" modifies the entire preceding clause, CTI's interpretation is untenable because the IDN agreements are not "between" CTI and the end users. Instead, they are between Oridion/Covidien and the end users. Covidien further contends that this purported ambiguity is not material because it does not relate to which party has the right to sell Oridion products to the end users after termination.

Relatedly, CTI asserts that the language "Distributor's agreements with end-users" is ambiguous because it does not

15

specify "whether it is a prerequisite for CTI to be a party to an agreement . . . *or* whether CTI named in an agreement as the distributor is sufficient." Docket No. 75, at 10 (emphasis in original). CTI emphasizes that it was not necessary for the parties to clarify this issue when the parties signed the amended distribution agreement in 2008 because the parties did not begin using IDN agreements with end users until 2010. CTI cites to the fact that Covidien honored the price terms in the IDN agreements after termination as proof of Covidien's agreement with CTI's interpretation of this phrase—that it includes the IDN agreements. Covidien retorts that it complied with the IDN agreements' pricing terms because it was contractually obligated to do so under the IDN agreements, and not under the 2008 distribution agreement with CTI.

Next, CTI contends that "and shall sell" is ambiguous because, if Covidien truly honors the end-user agreements, then CTI must be the party to sell the product to the end users. Covidien counters that Covidien is clearly the subject of the verb "shall sell," and Covidien can honor the agreements by selling Oridion products to the end users in accordance with all the other terms of their agreements, such as pricing and shipping fees. In short, the parties' arguments with respect to the phrase "and shall sell" repeat their dispute over the meaning of the word "honor."

Finally, the parties contest the ambiguity and meaning of "established Oridion ODN Prices." Section 1(g) of the contract defines the term "Oridion ODN Price" as "the Oridion ODN price as listed in the Oridion Pricing Handbook." Amended and Restated Distribution Agreement, Docket No. 74, Ex. E, at 5. The parties agree that this definition refers to the discounted price at which distributors, like CTI, purchased product from Oridion, sometimes called the distributor or wholesale price. The parties also both acknowledge that neither CTI nor Covidien would sell products to the end users at this price.

CTI argues, however, that this phrase still refers to the defined term, and is evidence of the parties' intent for Covidien to sell to CTI at this price, and CTI to then sell to the end users. In contrast, Covidien maintains that "the only rational interpretation of § 15(d) entails construing [this phrase] to mean the price ultimately charged to the end-user by CTI." Docket No. 78, at 5. Again, Covidien asserts any ambiguity is immaterial because it relates to the price, as opposed to which party shall sell the product to end users upon termination.

As a preliminary matter, the Court rejects Covidien's arguments that any ambiguity with respect to the phrases "agreements between Distributor and end-users of Company Products provided for by this Agreement" and "established

17

Oridion ODN Prices" is immaterial. The issues of what agreements the contract requires Covidien to "honor" upon termination, and what price the Oridion products must be sold at, shed light on the central question of which party is entitled to continue selling Oridion products to customers until the termination of the end-user agreements. Given that the Court must interpret the contract as a whole, these issues have "the potential of affecting the outcome of the case," and are thus material. Calero-Cerezo, 355 F.3d at 19.

Considering the plain language of § 15(d) in context, I find that the 2008 distribution agreement is ambiguous with respect to which party is entitled to sell Oridion products to some of the end users upon termination. The phrase "honor those agreements" is ambiguous because "it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Barclays, 710 F.3d at 21. Both interpretations advanced by the parties are plausible based on the dictionary definition of the word "honor." This phrase could mean either that Covidien is required to sell the products to the end users directly, in accordance with the pricing and shipping terms of the end-user agreements, or that Covidien is required to keep CTI as the distributor.

Furthermore, the use of the defined term "Oridion ODN Prices" is inconsistent on its face with the rest of § 15(d).

18

See Farmers Ins., 632 F.3d at 783. The parties agree that neither CTI nor Covidien would sell to the end users at the wholesale price, as use of the defined term would require. To do so would seemingly conflict with the obligation that Covidien "honor" the end-user agreements, which contain their own pricing terms. Thus, the meaning of "Oridion ODN Prices" is also ambiguous in the context of § 15(d).

However, the phrases "agreements between Distributor and end-users of Company Products provided for by this Agreement" and "Distributor's agreements with end-users" are not susceptible of more than one reasonable interpretation. CTI admits that it was not a party to the IDN agreements, even though it helped to negotiate the price terms in said agreements, and it continued to serve as the distributor for some period thereafter. These end-user agreements are not "agreements between Distributor and end-users of Company Products" nor "Distributor's agreements with end-users" (emphasis added). Instead, they are agreements between Covidien and the end users.

The Court finds that the 2008 distribution agreement unambiguously grants Covidien, not CTI, the right to sell Oridion products to the ten end users who signed IDN contracts

directly with Covidien.[3] As discussed above, the distribution agreement grants Covidien the right to terminate the agreement immediately "to engage in a direct sales effort" in CTI's territory, as long as Covidien provides written notice to CTI. Amended and Restated Distribution Agreement, Docket No. 74, Ex. E, at 14. Covidien provided CTI with more than thirty-days advance written notice, even though it could have terminated the contract effective immediately. Irrespective of the ambiguity surrounding the use of the phrases "honor those agreements" and "established Oridion ODN Prices," § 15(d) does not apply to the IDN agreements to grant CTI the right to continue selling to the end users until the termination of their contracts because CTI is not a party to the IDN agreements.

However, the 2008 distribution agreement is ambiguous with respect to whether Covidien or CTI had the right to continue selling products to eight of the remaining end users, who had supply agreements directly with CTI.[4] The parties dispute whether the final end user, Sparrow Health, had finalized an IDN

---

[3] The ten end users with IDN contracts are CentraCare, Community Health, Franciscan Alliance, HealthPartners, Indiana University Health, the Mayo Clinic, Northern Michigan Supply Alliance, Norton Healthcare, Ohio Health, and St. Elizabeth's.
[4] The eight end users who had supply agreements with CTI, and no agreement directly with Oridion/Covidien, are Allina Hospitals, Cleveland Clinic, Fairfield Medical Centers, Fairview Health Services, Licking Memorial Hospital, Our Lady of Bellefonte Hospital, Parkview Health Systems, and Summa Health.

contract with Covidien by the time of termination. Given that the IDN contracts are not agreements between CTI and the end users, the parties hyperventilate unnecessarily with respect to this issue. The dispute is immaterial. CTI has offered no evidence that it had a separate supply agreement with Sparrow Health, and, therefore, the 2008 distribution agreement also unambiguously grants Covidien the right to sell to Sparrow Health after termination. The Court allows Covidien's motion for summary judgment in part on CTI's breach of contract claim with respect to the ten end users who had IDN agreements directly with Oridion/Covidien and Sparrow Health.

### C. Extrinsic Evidence

In the alternative, Covidien argues that, even if the 2008 distribution agreement is ambiguous, the extrinsic evidence about the parties' intended meaning with respect to § 15(d) is so one-sided that no reasonable jury could decide in CTI's favor. Covidien emphasizes that the only change the parties made to the form distribution agreement Oridion presented to CTI in 2008 was to extend "the length of time for which Covidien must honor the end-user agreements, from the anniversary date of the Agreement to the termination date of the end-user agreements." Docket No. 67, at 8.

Covidien also contends that CTI considered asking for "commissions" in the negotiations, which would have provided CTI

with the same economic benefits as continuing to serve as the distributor until the termination of the end-user agreements. Id. According to Covidien, CTI chose not to even ask for the "commissions" because CTI believed that Oridion would not accept such a proposal. Covidien points to a draft "Addendum to the Distribution Agreement," which CTI never presented to Oridion, to support this argument.

The addendum was drafted by Dan Hyun, a business associate and friend of CTI's President, Mr. Forchione. Mr. Hyun advised Mr. Forchione in some of the contract negotiations. Mr. Forchione testified in his deposition that he doesn't believe he ever presented the addendum to Oridion because he thought it would be "pushing the envelope." Forchione Dep., Docket No. 74, Ex. B, at 49. Given that the commissions would have provided CTI with a similar economic benefit as allowing CTI to continue to serve as the distributor, Covidien argues that CTI's failure to even present the commission proposal to Oridion is evidence that Oridion would never have agreed to allow CTI to continue to serve as the distributor for any of the end users after termination of the 2008 distribution agreement.

CTI responds that the parties did more than extend the length of time for which Covidien must honor the agreements in changing the language in § 15(d). CTI points to the fact that Mr. Forchione was originally reluctant to sign the 2008

distribution agreement "absent protection for his investments and associated profits." Docket No. 75, at 13. Mr. Forchione sent Oridion's President, Mr. Feldman, a letter to this effect during the negotiations, and had a conversation with him about his concerns. In response, Mr. Feldman instructed Oridion's Vice President of Global Sales, Tom Millonig, to make Mr. Forchione "happy" and to get Mr. Forchione to sign the agreement. Feldman Dep., Docket No. 74, Ex. A, at 43. In his subsequent discussions with Mr. Millonig, Mr. Forchione explained how CTI had distribution agreements with other manufacturers under which CTI "was able to continue to sell the product" after termination of the contracts. Millonig Dep., Docket No. 74, Ex. C, at 43-44. CTI alleges that Mr. Forchione drafted the new language for § 15(d) based on his concerns, and emphasizes that Mr. Forchione specifically initialed the change in the final signed 2008 distribution agreement to highlight it.

CTI also counters that Covidien's reliance on the draft addendum is a red herring because it was prepared by Dan Hyun, and not anyone at CTI. Mr. Hyun had no role in drafting the actual change to § 15(d) adopted by the parties. Furthermore, the addendum addresses a commission, as opposed to an arrangement whereby CTI would continue to sell Oridion products to the end users until the termination of their contracts. CTI argues that Mr. Forchione suggested an arrangement whereby CTI

would continue to serve as the distributor until the termination of the end-user agreements, instead of asking for some form of commission, because CTI knew that Oridion would not accept the commission alternative.

The Court finds that this extrinsic evidence about the parties intended meaning behind the change to § 15(d) is not "so one-sided that no reasonable person could decide to the contrary." Farmers Ins., 632 F.3d at 784. The meaning of the ambiguous contract terms "honor those agreements" and "Oridion ODN Prices" in § 15(d) is therefore a question of fact for the jury. I deny Covidien's motion for summary judgment in part on CTI's breach of contract claim with respect to the meaning of these phrases, and the eight end users who had supply agreements with CTI at termination.

## III. **Breach of the Covenant of Good Faith and Fair Dealing**

CTI argues that Covidien breached the implied covenant of good faith and fair dealing in two instances: (1) in the negotiations surrounding § 15(d) and Covidien's "associated failure to abide by the specifically negotiated terms" upon termination, and (2) the measures Covidien took "to induce CTI to promote the IDN Agreements to its customers knowing full well that CTI would ultimately be terminated as the distributor under the IDN arrangements." Docket No. 75, at 15. Covidien contends that CTI's claim for breach of the implied covenant fails as a

24

matter of law because "it is either wholly redundant with the
contract claim or it would negate express contract terms."
Docket No. 67, at 13. Covidien also maintains that any
statements made or actions taken during the negotiations with
respect to § 15(d) are inadequate for a breach of the implied
covenant because the covenant only applies to conduct that
occurs during contract performance, not pre-contract formation.

### A. Legal Standard

"Under Massachusetts law, 'every contract implies good
faith and fair dealing between the parties to it.'" Young v.
Wells Fargo Bank, N.A., 717 F.3d 224, 237-38 (1st Cir. 2013)
(quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 924 N.E.2d
696, 703-04 (Mass. 2010)). The implied covenant of good faith
and fair dealing provides that "neither party shall do anything
that will have the effect of destroying or injuring the right of
the other party to the fruits of the contract." Id. (quoting
T.W. Nickerson, 924 N.E.2d at 704). In other words, "the parties
to a contract implicitly agree 'to deal honestly and in good
faith in both the performance and enforcement of the terms of
their contract.'" Biltcliffe v. CitiMortgage, Inc., 952 F. Supp.
2d 371, 381 (D. Mass. 2013), aff'd, 772 F.3d 925 (1st Cir. 2014)
(quoting Hawthorne's, Inc. v. Warrenton Realty, Inc., 606 N.E.2d
908, 914 (Mass. 1993)). "[T]he prohibition contained in the
covenant applies only to conduct during performance of the

contract, not to conduct occurring prior to the contract's existence, such as conduct affecting contract negotiations." AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001).

"A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract." Massachusetts v. Schering-Plough Corp., 779 F. Supp. 2d 224, 240 (D. Mass. 2011) (quoting Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005)). However, "the requirement of good-faith performance ultimately is circumscribed by the obligations—the contractual 'fruits'—actually contained in the agreement." AccuSoft, 237 F.3d at 45. "As a consequence, the implied covenant cannot create rights and duties not otherwise provided for in the existing contractual relationship, and instead focuses on the manner of performance." Young, 717 F.3d at 238 (internal quotation marks and citations omitted). "Nor does the covenant apply where the defendant has exercised an express contractual power in good faith—that is, in a manner that comports with the parties' reasonable expectations as to performance." Speakman, 367 F. Supp. 2d at 132.

The plaintiff bears the burden of presenting evidence to demonstrate a lack of good faith, such as "a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will." Young, 717 F.3d at 238. "Evidence

that a party behaved in a manner unreasonable under all the
circumstances may indicate a lack of good faith, but the core
question remains whether the alleged conduct was motivated by a
desire to gain an unfair advantage, or otherwise had the effect
of injuring the other party's rights to the fruits of the
contract." Id. (internal quotation marks and citations omitted).
When the claim of unfairness involves a contract's termination,
the Court "should look at the consequences of the termination to
determine if it resulted in a deprivation of earnings, loss of
good will, or loss of investment, and if the plaintiff was
subject to unfair dealing." Piantes v. Pepperidge Farm, Inc.,
875 F. Supp. 929, 938 (D. Mass. 1995) (internal quotation marks,
alterations, and citations omitted).

**B. Analysis**

Here, the Court agrees with Covidien that any conduct
surrounding the negotiation of § 15(d) is insufficient to
support CTI's claim of breach of the implied covenant of good
faith and fair dealing because the covenant only applies to
conduct during contract performance. See AccuSoft, 237 F.3d at
45. The negotiation took place before the parties signed the
2008 distribution agreement.

However, CTI also alleges that Covidien breached the
covenant by repeatedly representing to CTI that it would remain
as "the exclusive distributor for its IDN customers for the

length of each IDN Agreement" during the course of performance, both before and after Covidien made the decision to terminate the agreement and engage in a direct sales effort. Docket No. 75, at 17. Several sales representatives from CTI testified at their depositions that Dan McGuinness, Oridion's Regional Manager, and Carl Lowery, Covidien's IDN Director, described the IDN contracts as "annuities" for CTI that would protect CTI's business, should Oridion ever be bought or sold, because CTI was named as the distributor in the IDN contracts. See, e.g., Farmer Dep., Docket No. 74, Ex. I, at 30-35; Coyle Dep., Docket No. 74, Ex. K, at 36-40. Carl Lowery could not specifically recall using the word "annuity" at his deposition, but explained that it was in Oridion's, and later Covidien's, "best interest" for the distributors to "aggressively" grow the business through the IDN contracts. Lowery Dep., Docket No. 74, Ex. F, at 56, 74.

Mr. Lowery also testified that he was instructed not to share the terms of the IDN agreements, which stated that Oridion/Covidien could assume the distributor's obligations at any time, with CTI. Id. at 64-65. Mr. Lowery could not recall ever informing anyone at CTI about this provision. Id. at 66-67. Ms. Farmer, a CTI employee, similarly testified that, when she asked to see a copy of the IDN agreements, Mr. Lowery told her that he was not permitted to show her. Farmer Dep., Docket No. 74, Ex. I, at 76-78.

CTI also points to an email from Mr. Millonig to several Covidien employees on October 30, 2012, which states that Covidien's plan to go direct in April 2013 "is not broadly publicized and I'm very concerned that this is being communicated . . . . The growth of the [Oridion Distribution Network] channel will be compromised if this information leaks." Docket No. 74, Ex. Q. In his deposition, Mr. Millonig explained he that did not want Covidien's plan to go direct to be shared with distributors, such as CTI, because the distributors would lose motivation to continue to sell: "[A]ny discussion about going direct, when we had been working very hard to keep people motivated moving forward and making money while we could, including the [Oridion Distribution Network], would be a problem." Millonig Dep., Docket No. 74, Ex. C, at 96–97. Also in October 2012, Covidien gave a PowerPoint presentation at an annual meeting with its distributors, in which it described Covidien and the distributors as "moving forward" together as part of its "vision of the future." Docket No. 74, Ex. P, at 6, 10. The presentation also describes the IDN contracts as requiring business to "flow through" the distributors, such as CTI. Id. at 20.

Construing the facts in the light most favorable to CTI, and drawing all reasonable inferences in its favor, I deny Covidien's motion for summary judgment on CTI's claim for breach

of the implied covenant of good faith and fair dealing. Although Covidien did not violate § 15(d) of the contract by terminating the 2008 distribution agreement and selling directly to the IDNs, a party can breach the implied covenant without breaching an express term of the contract. Massachusetts v. Schering-Plough Corp., 779 F. Supp. 2d at 240.

CTI had relationships with at least some, if not all, of the IDN customers before they signed IDN contracts directly with Oridion/Covidien. Mr. Lowery testified at his deposition that CTI was "integral" in establishing the IDN contracts. Lowery Dep., Docket No. 74, Ex. F, at 70. In some cases, the IDN agreements replaced pre-existing pricing and supply agreements between CTI and the IDN customers. Covidien admits that CTI may have had lower margins and lower commissions under the "tiered pricing" structure in the IDN agreements, compared to pre-existing supply agreements. Docket No. 79, at 12. CTI has thus met its burden to put forward evidence demonstrating a genuine dispute of material fact over whether Covidien made misrepresentations to CTI to gain an unfair economic advantage through the IDN agreements, or otherwise deny CTI the fruits of the 2008 distribution agreement.

## IV. __Unjust Enrichment__

CTI alleges that Covidien was unjustly enriched by CTI selling the IDN agreements to its customers. As discussed above,

CTI played a critical role in establishing these contracts. Covidien retorts that CTI's unjust enrichment claim is precluded because the 2008 distribution agreement expressly regulates the parties conduct with respect to the IDN contracts. Covidien emphasizes that the parties amended the 2008 distribution agreement each time they negotiated a new IDN contract to incorporate the price terms for that customer, including both the price to be charged to CTI and the price to be charged to the IDN end user.

"A claim for unjust enrichment generally cannot stand where there is an existing, express contract, unless the contract is not valid." Philibotte v. Nisource Corp. Servs. Co., 793 F.3d 159, 167 (1st Cir. 2015); see also Zarum v. Brass Mill Materials Corp., 134 N.E.2d 141, 143 (Mass. 1956) ("The law will not imply a contract where there is an existing express contract covering the same subject matter."). This is because "a claim of unjust enrichment is not available to a party with an adequate remedy at law." Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 487 (D. Mass. 2015) (internal quotation marks, alterations, and citations omitted).

CTI does not challenge the validity of the 2008 distribution agreement. Instead, CTI cites to America's Growth Capital, LLC v. PFIP, LLC, 73 F. Supp. 3d 127, 153 n.192 (D. Mass. 2014), for the proposition that unjust enrichment is

possible between two parties to a contract if one party acts "outside of its contractual obligations to its detriment and the other party's benefit." Docket No. 75, at 22. The Court agrees with Covidien that CTI's reliance on this case is misplaced.

The America's Growth Capital court explained in a footnote that where "a party accepts gratuitous services outside of a contractual relationship," the typical rule barring a claim for unjust enrichment does not apply. 73 F. Supp. 3d at 153 n.192. In America's Growth Capital, the plaintiff "performed valuable services for Planet Fitness that materially contributed to the successful sale of the company" to a third party. Id. at 153. The third party investment group, however, was not on an enumerated list of companies for which the plaintiff was entitled to receive a multimillion-dollar strategic transaction fee. Id. at 152. The contract at issue, an engagement letter, specified that the plaintiff could only receive the fee if the ultimate purchaser was one of the investment firms identified in an exhibit to the letter. Id. at 152-53. After a bench trial, the court found that the plaintiff had viable claims for unjust enrichment and quantum meruit because the defendant accepted gratuitous services outside of the parties' contractual relationship under the engagement letter. Id. at 153 n.192.

Here, CTI's efforts alongside Oridion/Covidien to establish the IDN contracts did not constitute a "gratuitous" service

32

outside its contractual relationship with Covidien. Section 8(b) of the 2008 distribution agreement required CTI to use "its best efforts to actively promote sales" of Oridion products within its defined territory. The parties specifically amended the agreement to incorporate the price terms in the IDN contracts. Furthermore, CTI was compensated for sales it made to the IDN customers through the IDN agreements by the negotiated margins in each. Therefore, I allow Covidien's motion for summary judgment with respect to CTI's unjust enrichment claim because the 2008 distribution agreement governs the same subject matter.

## V.    Negligent Misrepresentation

CTI argues that Covidien's assurances that CTI would remain the distributor for the IDN customers for the duration of the IDN agreements constitute negligent misrepresentation. CTI points to the representations made by Mr. McGuinness, Mr. Lowery, and Mr. Millonig discussed above, in which Oridion/Covidien employees described the IDN contracts as "annuities" that would protect CTI in the event Oridion was acquired. CTI also emphasizes the PowerPoint presentation from the October 2012 annual distributor meeting that stated the IDN contracts required business to "flow through" the distributors.

Under Massachusetts law, a defendant is liable for negligent misrepresentation when (1) in the course of business transactions, (2) it supplies false information for the guidance

of others (3) in their business transactions (4) causing and
resulting in pecuniary loss to others (5) by their justifiable
reliance on the information, and (6) it fails to exercise
reasonable care or competence in obtaining or communicating the
information. DeWolfe v. Hingham Centre, Ltd., 985 N.E.2d 1187,
1192 (Mass. 2013). Covidien contends that CTI's alleged reliance
on the "informal statements made by Covidien sales personnel—
including statements made orally, in email, and in a slide
presentation," in the face of the 2008 distribution agreement
and amendments thereto, was unreasonable as a matter of law.
Docket No. 67, at 18.

Reliance is typically a question of fact for the jury.
Marram v. Kobrick Offshore Fund, Ltd., 809 N.E.2d 1017, 1031
(Mass. 2004). "However, in some circumstances a plaintiff's
reliance on oral statements in light of contrary written
statements is unreasonable as a matter of law." Id. When the
defendant's conduct conflicts with an express written statement,
the conflict puts the plaintiff "on notice that [it] should not
rely on either statement." Trifiro v. N.Y. Life Ins. Co., 845
F.2d 30, 33 (1st Cir. 1988). "Confronted by such conflict a
reasonable person investigates matters further; he receives
assurances or clarification before relying. A reasonable person
does not gamble with the law of the excluded middle, he suspends
judgment until further evidence is obtained." Sands v. Ridefilm

34

Corp., 212 F.3d 657, 665 (1st Cir. 2000) (quoting Trifiro, 845 F.2d at 33).

In Trifiro, the court held that the plaintiff unreasonably relied on oral statements "about the procedure for purchasing properties" from the defendant. 845 F.2d at 33. One of the defendant's officers told an agent for the plaintiff that although any deal would have to be approved by a committee, the "committee approval would be a mere formality." Id. Shortly thereafter, the defendant sent the plaintiff a letter stating that the committee had "sole discretion" to accept or reject the deal, and requesting that the plaintiff acknowledge his understanding of the committee approval requirement by returning a signed copy of the letter. Id. The plaintiff then signed and returned the letter as requested. Id. The Court found that it was unreasonable for the plaintiff to rely on the oral assurance that "committee approval would be a mere formality," after expressly acknowledging facts to the contrary. Id. "When a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law." Id. Similarly, in Sands, the First Circuit held that it was unreasonable for the plaintiff to rely on oral assurances from a prospective employer in the face of a written memorandum and letters explaining that the defendants could not

commit to a start date or formal employment agreement until they confirmed a source of funding. 212 F.3d at 664-65.

Here, Covidien argues that CTI's reliance on Covidien's employees' informal statements was unreasonable because the 2008 distribution agreement, and its corresponding amendments incorporating the IDN contracts' price terms, unambiguously provide that Covidien will sell directly to the IDN users upon termination. Because I agree with Covidien's interpretation of § 15(d) with respect to the IDN contracts, I find that CTI's reliance was unreasonable as a matter of law. To be sure, the 2008 distribution agreement does not expressly address the IDN contracts, in part because the parties did not begin to establish IDN contracts until several years after signing the distribution agreement. And the contemporary amendments to the 2008 distribution agreement focus on the new price terms for each IDN. While the distribution agreement and its corresponding amendments do not explicitly address which party will sell to the IDN customers upon termination, the distribution agreement does specify that Covidien can terminate the contract to engage in a direct sales effort at any time. As discussed above, although § 15(d) may allow CTI to continue to serve as the distributor for some end-users that had supply agreements directly with CTI for the duration of those contracts, it does

not give CTI the right to continue to sell to the IDN customers,
which had agreements directly with Covidien.

In short, there was an obvious "conflict" between the 2008
distribution agreement and Covidien's representations with
respect to the IDN contracts that should have put CTI on notice
about the unreliability of Covidien's statements. Trifiro, 845
F.2d at 33. Each time the parties amended the 2008 distribution
agreement to incorporate the IDN contracts' price terms, the
parties included the following language: "Except as expressly
set forth above, no terms or provisions of the Distribution
Agreement are changed, modified, or otherwise affected by this
Amendment." See, e.g., Docket No. 68, Ex. 10, at 3. Therefore,
the amendments to the distribution agreement did not change the
plain language of § 15(d), which does not grant CTI the right to
continue to sell to the IDN customers upon termination. The
Court allows Covidien's motion for summary judgment with respect
to CTI's claim for negligent misrepresentation.

## VI.  Massachusetts General Laws Chapter 93A

CTI bases its Chapter 93A claim on the same conduct as its
claim for breach of the implied covenant of good faith and fair
dealing: Covidien's alleged deceptive statements with respect to
its decision to go direct and the IDN agreements. Covidien
argues that CTI's Chapter 93A claim fails as a matter of law
because all of CTI's other causes of action do, and at best,

37

Covidien's conduct "entails a conventional breach of contract and nothing more." Docket No. 67, at 20.

"Under §§ 2 and 11 of Chapter 93A, it is unlawful for those engaged in trade or commerce to employ 'unfair methods of competition and unfair or deceptive acts or practices' in business transactions with others engaged in trade or commerce." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (quoting Mass. Gen. Laws ch. 93A, § 2). Although there is "no clear definition of what conduct constitutes an 'unfair or deceptive' act," courts require the objectionable conduct to "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir. 1996). "In short, a chapter 93A claimant must show that the defendant's actions fell within at least the penumbra of some common-law, statutory, or other established concept of unfairness, or were immoral, unethical, oppressive or unscrupulous, and resulted in substantial injury to competitors or other businessmen." Id. (internal quotation marks, alterations, and citations omitted).

"Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a Chapter 93A violation is a question of law." Id. at 797; see also Casavant v. Norwegian Cruise Line Ltd., 952 N.E.2d 908,

911-12 (Mass. 2011). "It is well established that breach of a contract can lead to a violation of Chapter 93A." Ahern, 85 F.3d at 798 (citing Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991)). However, the mere fact "that a party knowingly breached a contract does not raise the breach to the level of a Chapter 93A violation," without more. Id. To constitute an unfair or deceptive act, the objectionable conduct must be "in disregard of known contractual arrangements and intended to secure benefits for the breaching party," or otherwise use the breach "as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract [must have] an extortionate quality that gives it the rancid flavor of unfairness." Id. at 798-99 (citations omitted).

For the reasons discussed above with respect to CTI's claim for breach of the implied covenant of good faith and fair dealing, the Court finds that CTI has met its burden to put forward evidence demonstrating a genuine dispute of material fact over whether Covidien intentionally made false representations about its decision to go direct, and whether CTI would continue to serve as the distributor under the IDN agreements upon termination. Covidien asserts that, even if it accepts CTI's account of when Covidien decided to go direct, only two IDN contracts were signed after the decision was made.

While that may be so, the timeline is unclear and disputed. CTI claims that Covidien had finalized its plans to go direct by September 2012, months before it actually did so in April 2013. Meanwhile, Covidien maintains that there was still "a lot of volatility about if and when [it] would go direct" as of October 2012. Millonig Dep., Docket No. 74, Ex. C., at 95-96.

Furthermore, there is a genuine dispute of material fact over whether CTI was aware of the clause in the IDN agreements granting Covidien the right to assume, at any time, the distributor's obligations, and sell directly to the IDN customers, and whether Oridion/Covidien attempted to hide the terms of the IDN contracts from CTI. CTI alleges that it was not aware of the key provision, while Covidien maintains that at least two of the end users, Indiana University Health and HealthPartners, emailed CTI a copy of their IDN agreements in May 2012 and August 2012, respectively. As discussed above, Mr. Lowery testified at his deposition that he was instructed not to share the terms of the IDN agreements with CTI, and could not remember ever telling anyone at CTI about this provision. Lowery Dep., Docket No. 74, Ex. F, at 64-67. Ms. Farmer also testified that, when she asked for a copy of the IDN agreements on behalf of CTI, Mr. Lowery responded that he was not allowed to share the IDN contracts with her. Farmer Dep., Docket No. 74, Ex. I,

at 76-78. Thus, the Court denies Covidien's motion for summary judgment on CTI's Chapter 93A claim.

## ORDER

The defendant's motion for summary judgment (Docket No. 66) is **ALLOWED** in part and **DENIED** in part. The motion for summary judgment on CTI's breach of contract claim (Count I) with respect to the IDN customers and Sparrow Health, CTI's unjust enrichment claim (Count III), and the negligent misrepresentation claim (Count V) is **ALLOWED**. The motion for summary judgment on CTI's breach of contract claim (Count I) with respect the eight end users that had supply agreements directly with CTI, CTI's claim for breach of the implied covenant of good faith and fair dealing (Count II), and violations of Chapter 93A, § 11 (Count VI) is **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge